**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **C.A. No. 03-206T** |
| **UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF NAVY, DONALD RUMSFELD, in his capacity as the SECRETARY OF DEFENSE, and GEORGE ENGLAND, in his capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE NAVY,** | ) | |
| **Defendants.** | ) | |

**JOINT MOTION FOR ENTRY OF CONSENT DECREE**

**INTRODUCTION**

Plaintiff State of Rhode Island and Providence Plantations ("State") and Defendant United States of America ("United States") (the "Parties") jointly move the Court to enter the attached proposed Consent Decree in this action. The proposed Consent Decree resolves all of the claims in this case. The proposed Consent Decree is fair and reasonable, and is in the public interest. Therefore, the Parties respectfully request that the Court grant this motion and enter the proposed Consent Decree.

## BACKGROUND

### A. Nature of the Complaint

This is a civil action against the United States pursuant to Section 107 of Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607; the federal Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the federal and Rhode Island Clean Water Acts, respectively 33 U.S.C. § 1251 et seq. and R.I. Gen. Laws § 46-12-1 et seq.; and state common law. The complaint seeks reimbursement of past and future response costs incurred by the State and for natural resource damages to groundwater and air allegedly caused by the release of hazardous substances on and around Calf Pasture Point ("CPP" and/or the "Site"), which is a part of the former-Davisville Naval Construction Battalion Center ("NCBC Davisville") located in North Kingston, RI.

### B. Description of Facility and History of Operations

In 1939, Quonset Point was acquired by the Navy to establish a Naval Air Station and in 1942 the operations at Quonset Point expanded into what is now called NCBC Davisville. NCBC Davisville provided mobilization support to the active Naval Construction Force; was a mobilization base for the rapid assembly outfitting and readying of Reserve Construction Battalions; stored, preserved and shipped advanced base and mobilization stocks; and procured, received, packed and shipped

collateral equipment for military construction projects. NCBC Davisville was decommissioned and closed on April 1, 1994.

NCBC Davisville is located approximately 18 miles south of Providence, RI, in North Kingston, and is approximately 900 acres. Calf Pasture Point is a peninsula located on the northeastern portion of NCBC Davisville. Calf Pasture Point consists of two contiguous parcels; a northern parcel and a southern parcel. The northern portion of Calf Pasture Point, consists of approximately 109 acres. The southern parcel, known as "Site 07," consists of approximately 78 acres, and was allegedly the location of disposal activities that allegedly injured groundwater beneath Site 07. Site 07 was the subject of a remedial investigation performed by the Navy pursuant to CERCLA. Together, these two parcels comprise what is called Calf Pasture Point.

**C. Closure of NCBC Davisville and Transfer of Calf Pasture Point to Town of North Kingstown**

In 1991, the Defense Base Closure and Realignment Commission recommended closure of NCBC Davisville. Pursuant to authority contained in the Federal Property and Administrative Service Act of 1949 ("Federal Property Act"), as amended, and applicable rules, regulations and orders promulgated thereunder, the NCBC Davisville property was determined to be surplus to the needs of the United States. Under the Federal Property Act, property determined to be surplus can be disposed through a public benefit

conveyance for designated uses.

Subsequently, on June 9, 2000, the Navy assigned the CPP Site to the Department of the Interior for conveyance to the Town of North Kingstown via a public benefit conveyance for park and recreational purposes. On August 14, 2002, a Quitclaim Deed was executed between the United States (through the National Park Service), as Grantor, and the Town of North Kingstown, as Grantee, and Calf Pasture Point was transferred to the Town.

**D. Remedy Selection**

NCBC Davisville was placed on the CERCLA list of national priority sites on November 21, 1989. In March 1992, EPA, the State and the Navy entered into a Federal Facility Agreement under CERCLA Section 120 ("FFA"). 42 U.S.C. § 9620. The purpose of the FFA is to ensure investigation and remediation of NCBC Davisville, and to establish a framework and time table for the development, implementation and monitoring of response actions at the site. Specifically, and among other reservations, the FAA does not bar claims for natural resource damage assessments, or for natural resource damages.

The FFA states that the Navy will take response actions at NCBC Davisville. Specifically, the Navy agreed to undertake, seek adequate funding for, and fully implement removal actions; study area screening evaluations; perform Remedial Investigations and Feasibility Studies; design proposed plans and Records of

Decisions ("RODs"); undertake remedial actions, remedial designs, and "Operations and Maintenance." A separate agreement governs the Navy's responsibilities to pay the State's response costs. The Navy's ongoing cleanup responsibilities are not changed by the terms of the proposed Consent Decree.

Site 07 is that portion of NCBC Davisville that was designated as Site 07 in the FFA. The September 1999 Final CERCLA Record of Decision ("ROD") for Site 07, which set forth the final chosen remedy for Site 07, imposed long-term monitoring and groundwater deed restrictions for Calf Pasture Point. On September 29, 1999, the Rhode Island Department of Environmental Management sent a letter of concurrence to EPA stating that it concurred with the final CERCLA ROD for Site 07.

**E. Nature of Alleged Federal Liability/Nature of NRD Claim**

The Navy owned and operated NCBC Davisville during its entire operation until the ownership of Calf Pasture Point was transferred to the Town of North Kingston on August 14, 2002.

The complaint alleges that Site 07 was the location of three distinct disposal incidents some time between 1960 and 1974, which are summarized in the Navy's 1984 Initial Assessment Study and the 1999 Record of Decision. The complaint requests judgment against the Navy as strictly liable for any and all: (1) natural resource damages; (2) future costs incurred by Rhode Island concerning the inspection, monitoring, evaluation, assessment,

sampling, analysis, and other removal or remedial response actions conducted at Site 07; and (3) interest, costs, attorneys' fees, damages, disbursements and other recoverable expenses. No dollar figure for damages was specified in the complaint.

The natural resources allegedly damaged by the disposal of hazardous substances at Site 07 include the groundwater and the air. The primary contaminants of concern are chlorinated VOCs predominantly known as 1,1,2,2-perchloroethane and trichloroethene ("TCE") - both found in a portion of Site 07's groundwater.

**THE PROPOSED CONSENT DECREE**

The proposed Consent Decree for Site 07 includes the following terms, generally stated below:

(A) The United States will pay the State the sum of $215,000.

(B) In exchange for the payment, the State covenants not to sue or take administrative action or further sue or prosecute the United States for Past Response Costs that may have been incurred by the State at the Site and/or for Natural Resource Damages resulting from releases at, on or from the Site under: (a) CERCLA Sections 107(a) or 113(f), 42 U.S.C.§ 9607(a), § 9613(f); (b) the Clean Water Act, 33 U.S.C. § 1251 et seq.; (c) the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; (d) Rhode Island Gen. Laws § 46-12-1, et seq.; (e) Rhode Island

common law; and (f) any other provision of statutory or common law.

(C) The United States will have protection from contribution claims with respect to natural resource damages and the State's past response costs at the Site.

(D) The State will use the settlement amount to restore, replace or protect natural resources equivalent to the natural resources that have allegedly been injured at the Site. See Attachment hereto: Proposed Project.

(E) The State reserves all of its rights to pursue its claims in C.A. 03-599T (D.R.I.) concerning the Allen Harbor Landfill Site.

(F) The State also reserves its right with respect to any future response costs at the Site.

**STANDARD OF REVIEW**

The well-settled standard of review applied to a proposed settlement under CERCLA is whether the settlement is fair (from both procedural and substantive standpoints), reasonable, and consistent with the statute's purposes. United States v. Davis, 11 F. Supp.2d 183, 189 (D.R.I. 1998), aff'd, 261 F.3d 1, 23-28 (1st Cir. 2001). See also United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990).

"[I]t is the policy of [CERCLA] to encourage settlements,"

Cannons Eng'g at 84, and there is "a presumption in favor of voluntary settlement." United States v. Akzo Coatings of Amer., Inc., 949 F.2d 1409, 1424, 1436 (6th Cir. 1991). In reviewing a CERCLA consent decree, a court must determine that the decree is fair, reasonable and "'consistent with the purposes that CERCLA is intended to serve.'" Cannons Eng'g, 899 F.2d at 85 (quoting H.R. Rep. No. 99-253, Pt. 3, at 19 (1985) reprinted in 1986 U.S.C.C.A.W. 3038,3042). Review of such settlements is committed to the "trial court's informed discretion ." Id. at 84 (citations omitted).

The Court's review of the proposed Consent Decree does not consist of a *de novo* review of the evidence, see id., however, "the Court must make an independent judgment as to whether the proposed settlement is fair and reasonable." United States v. Davis, 11 F. Supp.2d at 189 (citation omitted). A court may not substitute its own judgment for that of the parties to the decree. United States v. Jones & Laughlin Steel Corp., 804 F.2d 348, 351 (6th Cir. 1986) (a reviewing court may not modify but only approve or reject a consent decree).

Protection of the public interest is the key consideration

in assessing whether a decree is fair, reasonable and adequate. In re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1028 (D. Mass. 1989).

**DISCUSSION**

The Court should enter the proposed Consent Decree because it is fair, reasonable and in the public interest. The proposed Consent Decree was the product of months of difficult negotiations between the Parties, between March 2004 and January 2005. The negotiations were conducted by legal and technical representatives from both Parties. The fact that the settlement was "negotiated at arm's length among experienced counsel" supports the request that it be approved. Cannons Eng'g, 899 F.2d at 87. Additionally, both Parties shared the views of experienced technical consultants conversant in the areas in dispute and freely exchanged numerous position papers which afforded the Parties ample information to consider the strength of their respective arguments. Moreover, Magistrate Judge Robert Lovegreen assisted in the settlement negotiations and was instrumental in guiding the Parties to a settlement. See Davis, 261 F.3d at 23 (assistance of magistrate judge noted in assessing

fairness of settlement).

The settlement provides damages to be paid by the United States to the State for the purpose of restoring, replacing or protecting natural resources equivalent to the resources that have allegedly been injured at the Site. Therefore, the settlement is in the public interest in that it will provide money to the State to use in a specific manner for the benefit of the public.

The settlement avoids potentially lengthy and costly litigation. The State and the United States agree to the terms. The settlement promotes CERCLA's goals by "reduc[ing] the time and expense of . . . litigation that necessarily diverts money from cleanup and restoration." In re Acushnet River & New Bedford Harbor, 712 F. Supp. at 1027.

Consequently, the proposed Consent Decree is fair, reasonable and consistent with CERCLA.

**CONCLUSION**

For the foregoing reasons, the Court should grant this motion and enter the proposed Consent Decree as an order of this Court.

Respectfully submitted,

**For the State of Rhode Island:**

TRICIA K. JEDELE
Special Assistant
Attorney General
Rhode Island
Department of
Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
Fax: (401)222-3016

**For the United States:**

LAUREL A. BEDIG
United States Department of
Justice
Environment & Natural
Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
Tel: (202) 305-0331
Fax: (202) 514-8865

ROBERT CLARK CORRENTE
United States Attorney
District of Rhode Island

MICHAEL P. IANNOTTI
Assistant United States
Attorney
District of Rhode Island

Dated: August 4, 2005

NORTH KINGSTOWN
INCORPORATED 1674

TOWN OF
NORTH KINGSTOWN, RHODE ISLAND

80 BOSTON NECK ROAD
NORTH KINGSTOWN, R.I. 02852-5762
PHONE: (401) 294-3331
www.northkingstown.org

July 15, 2005

RECEIVED
JUL 18 2005
Civil Division
Department of Attorney General

Ms. Trish Jedele
Office of the Attorney General
150 S. Main Street
Providence, RI 02903

RE: CERLA Natural Resources Damages
Calf Pasture Point, North Kingstown, RI

Dear Ms. Jedele:

This letter is in response to your request for additional information regarding the Sawmill Pond/Sandhill Brook restoration of wetlands, water quality improvements, and associated studies and design programs proposed to be undertaken with CERLA Natural Resources Damages program funds. We trust that the following will assist you.

In December of 2004, the Town contracted with Southern Rhode Island Conservation District (SRICD) for their technical expertise and to have them prepare a report that identifies the major issues and strategies necessary to move forward with improvements to Sawmill Pond that when implemented would improve groundwater quality in the area.

Since the contract began SRICD has gathered all available existing information on Saw Mill Pond in relation to water quality, conducted research and developed three potential strategies. They are now in the process of identifying additional technical expertise and preparing the first draft of the written report. In addition they have conducted several small group meetings and two public presentation meetings to gather public input. The first public meeting was held on June 23, 2005 and the second follow-up meeting will be held on Thursday, July 14th, 2005. Press releases and meeting notices were sent to the local newspapers, public officials, neighborhood groups and persons owning property near or adjacent to the pond. (Please see attached press releases).

Much of the work to date has focused on Sandhill Brook, the stream that flows into and out of the pond, and the Saw Mill Pond dam (constructed in the 1700s and rebuilt at least once since then), which is now failing.

The July 14th meeting will include a presentation of three possible courses of action for Sawmill Pond and Sandhill Brook. The proposed options include:

1. A full pond with a completely restored dam,
2. The construction of smaller pond with a restored dam, possibly smaller in size, and
3. The removal of the dam and the complete restoration of the stream to its natural state.

Once it is determined which course of action would be most beneficial to the improvement of the groundwater, to the restoration of the habitat, and also be acceptable to the neighborhood, the Town will work toward the implementation of those improvements.

Improvements in upland stormwater management for the purpose of improving surface and groundwater quality is an element that is shared by all three of the proposed Sawmill Pond improvement scenarios. The existing stormwater infrastructure around the pond consists of two catch basins at the end of Lake Drive that deliver water from Lake Drive and the Elementary School parking lot to an outlet right next to the causeway; a Brookside Drive outfall where stormwater is directed off the road into two asphalt channels that dump directly into Sandhill Brook, just south of the pond; and two catch basins at the end of Sachem Road that deliver water from that area to an outlet at the pond.

There is approximately 1.7 square miles of developed watershed that drains to Sandhill Brook above Saw Mill Pond's dam, with many contributing outfalls, and the three mentioned above flowing directly into the pond. Studies have shown that the waters are impaired and summer water temperatures are too high. The TMDL study for the Hunt River System, which Sandhill Brook contributes to, shows a 79% load reduction needed in Sandhill Brook to meet fecal coliform water quality standards.

Upland stormwater improvements are a critical element for all three possible scenarios at Sawmill Pond. The idea is to capture rain close to where it falls and facilitate the movement of water into the soil wherever possible.

These improvements would have two major interrelated benefits. They would:

1. Reduce the amount of stormwater coming off of the developed upland area into the stream and pond so that there are no highly erosive velocities and volumes carrying pollutants into the system.

2. Create opportunities for stormwater to soak into and filter through the soil so that it can either be taken up by the roots of trees or other plants and transpired back into the air or recharged into groundwater resources; then groundwater flows can contribute to the pond and stream more appropriately, at slower velocities and smaller volumes. Many waterways rely on groundwater flows and it is clear from USGS flow studies that Sandhill Brook is no exception. The brook is increasing in volume along its journey to the Hunt River.

We are anticipating that several locations will be chosen for infiltration improvements around the pond. According to soil survey maps for Rhode Island, these locations appear to be suitable for utilizing stormwater infiltration for groundwater recharge. It may also be useful to utilize groundwater infiltrators or other infrastructure below the soil surface to help facilitate this infiltration in some areas.

These implementation measures will require further study but from the information available the following additional groundwater recharge measures would be typical of measures recommended for installation in the Sawmill Pond/Sandhill Brook area to improve groundwater quality:

1. The traffic circle at Lake Drive that presents a key opportunity for groundwater infiltration. Currently the site is a grass mound, but if dug out with breaks in the curb and plantings it could effectively capture and soak in rainwater as a bioretention area or rain garden.

   Anticipated cost estimate for 7,800 square foot area $40,000.

2. Along Lake Drive, Sachem Road, and Brookside Drive, there appear to be opportunities where roadside rain gardens would be appropriate. This would involve a swale in the town right-of-way that could be planted all along the length of the roads. These have been used effectively in other areas to decrease pollutants in runoff and improve groundwater quality.

   Estimated cost estimate for 150 square foot rain gardens at 200 house lots at a cost of $10 per square foot is $300,000

3. At the Elementary School adjacent to the pond, it appears there is sufficient space to capture some stormwater runoff from Lake Drive and from the school's parking lot, a large part of which delivers sheet flow stormwater to Lake Drive. Stormwater could be directed to a below-ground infiltration device.

   Estimated cost for design & construction of an infiltrator structure is $55,000.

4. Prior to moving forward with any of the above measures that are recommended in the SRICD study the Town would contract with an engineering firm for a feasibility study.

   The estimated cost of the feasibility study is $15,000.

These estimated costs come to a total of $410,000 to implement water quality improvements through groundwater recharge measures at Saw Mill Pond.

In addition to the anticipated stormwater/groundwater water quality improvements listed above, it is anticipated that the SRICD study will recommend exploration of additional water quality, habitat restoration and recreational improvements that are outside the scope of what could be accomplished with the use of CERLA Natural Resources Damages funds. These anticipated improvements include the following:

- Installation of a forebay to limit sediment entering the pond; as noted above, the stormwater pipes in the neighborhood discharge directly into the pond. This includes stormwater flow from the nearby school parking lot.

- Installation of a fishway to allow fish to pass over the dam; information gathered by SRICD shows the pond to have very limited fish population of macrohabitat generalists, which can tolerate warm waters, sluggish streams, and ponds. It has not been determined whether the fish community is due to flow or temperature or possibly chemical contamination.

- Independent Sewage Disposal Systems upgrades in homes around the pond; it is estimated that thirty to forty percent of the homes near or around the pond are on cesspool systems for sanitary waste handling. Watershed tests show elevated nitrogen and fecal coliform counts. TMDL attributes fecal coliform to stormwater, waterfowl, and wildlife.

- Development of a perimeter trail system around the pond and possibly non-motorized boat access to the pond. Over the last five years, the Town has been working with the Davisville neighborhood residents, University of Rhode Island Landscape Architecture students and neighborhood groups to establish the pond area as a focus for the neighborhood. These efforts have resulted in the residents establishing annual earth day clean-ups around the pond area, town public works cooperation regarding removal of grass clippings and brush from the pond area and community efforts to bring private contributions to improvement around the pond area.

- Replacement of the causeway. There is a causeway that crosses the pond connecting two high-density residential neighbors and an elementary school. Inspection of the causeway indicates that there may be siltation on the sides and that the culvert may be failing and/or undersized. Subsequent to the determination regarding the restoration or removal of the dam the causeway will be evaluated regarding its contribution to the degradation of the pond and groundwater. Should the pond be dredged to allow a smaller pond and possible sediment management at the pond, a bridge replacing the causeway may be more appropriate and less constricting to the free flow of the water.

Restoration of the dam, dredging of the pond, and long-term sediment management with a forebay is a costly endeavor. Estimated costs cannot be determined until engineering studies are completed. It is the town's intent to work simultaneously toward all of the needed water quality and habitat restoration projects to promote the most cost effective and beneficial restoration of ground water quality and habitat of the Saw Mill Pond and the Sandhill Brook. It should be noted that the proposed scope of work for these improvements may change as the Saw Mill Pond report is completed, and an engineering feasibility report is completed. The major focus of the Town for this area is the improvement of water quality.

Thank you for the opportunity to fully identify and describe a project that would benefit the environment and balance the natural resource damage that has occurred at Calf Pasture Point. If you have any questions about the above or need additional information, please feel free to contact me or the Planning Director Jonathan Reiner Jr. (401) 294-3331, Ext 200 or 310 respectively.

Sincerely,

Richard Kerbel
Town Manager

Cc: North Kingstown Town Council
A. Lauriston Parks, Town Solicitor
Jonathan Reiner, Director of Planning
Phil Bergeron, Director of Public Works
Cynthia Olobri, Finance Director
Daniel O'Connor, Leisure Activities Director
Sue Licardi, Director of Water Supply
Richard Gottlieb, Department of Environmental Management
W. Michael Sullivan, Director of Department of Environmental Management